**NOT FOR PUBLICATION**

**FILED**
JAMES J. WALDRON, CLERK

**FEB. 21, 2012**

U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY:  s/ Ronnie Plasner, DEPUTY

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In Re: | Case No.: 06-17415 (DHS) |
| **BEST MANUFACTURING GROUP LLC,** | Chapter: 7 |
| Debtor. | Judge: Donald H. Steckroth, U.S.B.J. |

**OPINION**

**APPEARANCES:**

McCarter & English, LLP
Lisa S. Bonsall, Esq.
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07101
*Counsel to California First Leasing Corporation*

Wollmuth Maher & Deutsch LLP
James N. Lawlor, Esq.
One Gateway Center
Newark, New Jersey 07102
*Counsel to Best Textiles International Ltd.*

Becker Meisel LLC
Stacey L. Meisel, Esq.
Eisenhower Plaza II
354 Eisenhower Parkway
Suite 2800
Livingston, New Jersey 07039
*Counsel to Stacey L. Meisel, Chapter 7 Trustee for Debtor*
 *Best Manufacturing Group LLC, et al.*

**THE HONORABLE DONALD H. STECKROTH, BANKRUPTCY JUDGE**

Before the Court is the motion of California First Leasing Corporation ("CFLC") to compel the Debtors'[1] and Best Textiles International, Ltd.'s ("BTIL") compliance with a Consent Order Regarding the Payment of Administrative Expenses entered on March 13, 2007 ("Consent Order") and attendant non-use agreements and a cross-motion by BTIL to amend the Consent Order.

The Court has jurisdiction over this motion pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference from the United States District Court for the District of New Jersey dated July 23, 1984. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper under 28 U.S.C. § 1409. The following shall constitute the Court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

The Debtors each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on August 9, 2006. The Debtors and CFLC were parties to pre-petition equipment, computer hardware and software leases, including one designated Lease CL 00435 ("Lease") and Schedules 1 and 1A dated January 24, 2003 ("Lease Property"). The Debtors failed to make certain post-petition lease payments while continuing to use the Lease Property. On January 26, 2007, CFLC filed a motion to compel the Debtors to assume or reject the leases, require all Lease payments to be made, and for related relief. Subsequently, the Debtors filed a motion to sell substantially all of their remaining assets as well as assume and assign certain contracts and leases. CFLC objected to the sale on the grounds that unexpired leases to which it was a party could be neither assumed nor assigned until the cure amounts were paid and argued the Lease Property could not be sold free and

---

[1] The Debtors are Best Manufacturing Group, LLC; H.W. Baker Linen Co., LLC; Best Realty of New Jersey, LLC; Best: Artex, LLC; and H.W. Baker U.S., Inc.

3

clear of liens.  CFLC's objection was resolved and memorialized in the Consent Order and the sale of substantially all of the Debtors' remaining assets to BTIL was approved by this Court.

Pursuant to the terms of the Consent Order, the Debtors were required to return all Lease Property.  In addition, the Debtors and BTIL entered into separate non-use agreements with CFLC.  Under the non-use agreements, the Debtors and BTIL acknowledged they would not utilize Lease Property past February 28, 2007.  If this provision was violated, the Consent Order allowed payment of liquidated damages to CFLC in the amount of $30,464.39 per month of use by either the Debtors or BTIL beginning in March of 2007.  The Consent Order made the liquidated damage provision CFLC's exclusive remedy for use of the Lease Property.

The genesis of this dispute is the scope of the Consent Order's coverage.  Paragraph 4 of the Consent Order defines the term "Lease 1/1A Property" as the property . . . described in CL00435 Schedule 1 and 1A."  Schedule 1 of the Lease specifically references a "406-820 IBM I-Series 820-2436-1522 System, S/N: 10-F202B plus all replacement parts, substitutions, . . . updates, upgrades, . . . [and] enhancements. . . ."  However, in paragraph 8, the Consent Order provides that "[t]he Debtors shall certify and acknowledge the return of all the Lease 1/1A Property as of February 28, 2007, including, with respect to any and all *software*, all updates, upgrades, revisions and copies . . . ." (emphasis added).  In addition, the non-use agreements provide that neither the Debtors nor BTIL will utilize the property described in Lease 1/1A, which includes but is not limited to software, whether the software is used on hardware provided under the Lease or other hardware utilized on the Debtors' premises.  Thus, software is included within the defined Lease Property.

An item of Lease 1/1A property, an IBM AS400 server, was not returned to CFLC.  It is undisputed that, pre-petition, the Debtors returned that server to IBM and leased a more current

4

model from ANZ Leasing, LLC. This exchange was completed on or around September 26, 2005.[2] The lease through ANZ Leasing specifically references CFLC's server. As a result, the server leased by CFLC can no longer be recovered.

CFLC argues this conduct amounts to violations of the Lease agreement, Consent Order, and non-use agreements. CFLC requests that this Court obligate the Debtors to return its server, including all upgrades, or in the alternative, pay it the stipulated value of the IBM server from the date of conversion, $59,680. In addition, CFLC requests payment from the Debtors and/or BTIL for use of the server under the liquidated damages provision of the Consent Order for and including March of 2007 through May of 2007, or $91,393.17. Finally, CFLC argues that any amounts awarded constitute administrative claims against the Debtors' jointly administered estate.

The Debtors argue that they are not in breach of either the non-use agreement or the Consent Order as they were not in possession of the CFLC server at commencement and they ceased utilizing CFLC's leased software by February 28, 2007. The new server is an entirely separate and distinct machine from that provided by CFLC and it utilizes no hardware components from CFLC's server. Thus, as of the petition date, the Debtors were no longer in possession of the CFLC server. Therefore, even if the casualty value of the server were applicable here, which the Debtors question given the $1.00 buy-out option, CFLC's only remedy for its value is a general unsecured claim and the Consent Order does not render such a claim to be post-petition and therefore administrative in nature. Second, the Debtors argue that the property at issue as defined by the Consent Order was

---

[2] As provided for in the Lease casualty schedule, the stipulated value of the CFLC server on September 26, 2005 was $59,680. While the current value of CFLC's server is unknown, BTIL avers that its current value is "probably less than $5,000, depending on its configuration." (*See* Decl. of Robert Snead in Supp. of BTIL's Obj. and Cross-Mot. to Am. the Consent Order, ¶ 5)

only software and any upgrades thereto. Lastly, the Debtors ceased using the original software provided and related to CFLC's server before February 28, 2007.

BTIL objects to the relief requested by CFLC on several grounds. First, BTIL argues that this Court is without jurisdiction to determine the instant matter as any determination would only minimally impact the Debtors. BTIL also argues that the relief sought is improperly made by motion as it constitutes an attempt to recover money or property. Instead, an adversary proceeding is required. Third, CFLC maintains no interest in the server currently used by BTIL as it is an entirely distinct piece of equipment than that provided by CFLC. Fourth, the only reasonable construction of the Consent Order is that the parties did not intend to include property listed on Schedule 1 of the Lease within its scope. Fifth, BTIL argues that the Court should amend the Consent Order to exclude the Schedule 1 property under Federal Rule of Civil Procedure 60 on the basis of mistake or excusable neglect. Lastly, BTIL argues the Debtors are accountable to it in the event BTIL is held liable to CFLC. This is allegedly due to the Debtors' failure to advise BTIL, either before the entry of the Sale Order or the Consent Order, that CFLC maintained an interest in the upgraded server.

## **LEGAL ARGUMENT**

BTIL argues that the relief requested is only available within the confines of an adversary proceeding as this motion constitutes an action to recover money or property. *See* Fed. R. Bankr. P. 7001. This Court disagrees. The remainder of the motion, after the settlement discussed below, seeks to compel compliance with the Consent Order and the non-use agreements incorporated therein. Therefore, no adversary proceeding is necessary at this juncture in the proceeding.

Moreover, the motion constitutes a contested matter, discovery was taken by the parties, and an evidential hearing was conducted. Under the circumstances, the contention is without merit.

Immediately prior to an evidentiary hearing on the motion, Stacey Meisel, Chapter 7 Trustee ("Trustee") for the Debtors, BTIL, and CFLC consensually resolved the portion of this matter related to the IBM AS/400 server, the specific hardware at issue here. (*See* Consent Order in Settlement of Claims by CFLC Against Debtors for Failure to Return Server Pursuant to Consent Order and Against Debtors and Purchaser Best Textiles Inc. for Use of Server ("Settlement Order"), [ECF Doc. 999], Nov. 15, 2007) The Trustee paid $60,000 to CFLC in exchange for CFLC's withdrawing and settling its administrative claim against the Trustee. CFLC also withdrew its claims against BTIL for the alleged continued use of the server, or any upgrade of the server, in violation of the Consent Order. Thus, this settlement resolves CFLC's claims against the Debtors' estate in their entirety and leaves the Court to address BTIL's alleged continued use of the GEAC 21 Software System in violation of the Consent Order, which was the subject of the evidential hearing.

The dispute between BTIL and CFLC is centered upon whether BTIL used software in which CFLC had an interest in violation of the terms of the Consent Order. By way of background, in 1998, one of the Debtors, H.W. Baker Linen Co., LLC ("Baker"), purchased a license to use System 21 software ("Baker Standard") from JBA International, the predecessor-in-interest to CFLC. (*See* Hrg. Ex. BT-1) In 2002, the Debtors acquired Baker. (*See* BTIL's Ltr. in Lieu of Summation ("BTIL's Ltr."), 1) At the same time as that acquisition, Best Manufacturing Group LLC ("Best Manufacturing") began negotiating its own license agreement for use of the System 21 Style Software ("Best Style") provided by GEAC Enterprise Solution, Inc. ("GEAC"). (*See* Hrg. Tr. 84:2-

4; BT-4) Best Manufacturing chose the GEAC system for practical reasons since it was already in place at Baker. (*Id.* at 98:8-12) Thereafter, GEAC and Best Manufacturing entered into a license agreement which included the following provision in Supplement No. 1:

> The parties agree that if Customer acquires any business entity that has previously licensed Geac's Systems 21 and/or Style System 21 software applications pursuant to an applicable license agreement with Geac, such business entity may assign their licensed right to Customer for no additional license fees to be paid by Customer or such business entity. Prior to any such assignment, the parties shall execute Geac's then-current assignment agreement, which will not conflict with the terms hereof. It is also agreed that Customer shall have the right to upgrade such business entity license of the (a) Geac's System 21 software applications to the Style version of such software applications; and/or (b) the Style version of such software applications to the System21 version of such software applications at no additional charge.

(Hrg. Ex. BT-5, 10(b))

At the time of the license agreement, the Debtors made one payment to GEAC. (Hrg. Tr. 86:24-87:15) Thereafter, in 2003, the Debtors entered into a Lease Agreement with CFLC for hardware and software described on Schedules 1 and 1A, the Lease Property. (*See* Ex. P-5) Schedule 1 covered the GEAC Style Software licensed by Best Manufacturing which allowed for seventy-five (75) users. (*Id.* at 71-72) Schedule 1A covered the Baker Standard software allowing for fifty (50) users. (*Id.*) Thus, under the Assignment Agreement in conjunction with Best Manufacturing's License Agreement, Best Manufacturing was given an allowance for 125 users. (*See* Hrg. Ex. BT-2) In both Schedule 1 and 1A, the following is the operative language:

> N. OWNERSHIP OF PROPERTY: Lessor [GEAC] at all times retains ownership, title and/or control over Lessee's [Best Manufacturing] right to use the Property in accordance with the terms of the Lease. Lessee shall protect and defend, at its own expense, Lessor's title and/or rights in the Property against all claims and liens and keep the Property free and clear of all such claims and liens. The

> Property is and shall remain personal property of the Lessor. To the extent Software subject to this Lease may also be the subject of a license agreement between the Supplier [CFLC] and Lessee, Lessee acknowledges that the license to use the Software is being provided to Lessee solely because of payments made by Lessor to the Supplier and, accordingly, Lessee agrees that Lessor has an interest in the license.

(Ex. P-5)

It is by way of this language that CFLC contends it has the ability to control the Debtor's use of the software due to the maintenance payments it made to GEAC as detailed by the attached invoices to Exhibit P-5. (Hrg. Tr. 92:4-9) CFLC reimbursed Best Manufacturing for the 2002 initial payment and, thereafter, all payments related to the license were made by CFLC. (*Id.* at 93:4-8) CFLC also filed a UCC-1 Financing Statement to give notice that it had a secured interest in the property. (*Id.* at 93:22-94:8) All of this caused CFLC to believe it was a creditor of the Debtors. (*Id.* at 94:10)

In December 2006, the Baker Hospitality Division of the Debtors was sold to GHCL, Inc., of which Dan River, Inc. is a subsidiary. (*See* BTIL Ltr., 1.) Thereafter, the Court approved a sale of the Debtors' assets to BTIL. (*See* Order Approving Sale of Assets, [ECF Doc. 535], Feb. 9, 2007) Robert ("Scott") Snead, Vice President of Information Systems at Dan River, an affiliate of BTIL, testified that he evaluated Best Manufacturing's assets prior to the acquisition and researched the hardware and software that would be needed to transition onto BTIL's systems. (Hrg. Tr. 112:16-23) Snead understood that BTIL was not to use the Best Style system beyond February 28, 2007 as governed by the Consent Order. For that reason, the data on the Best Style system was migrated onto the Baker Standard system before that date. (*Id.* at 115:16-20) The two systems were not integrated and there was no sharing of data. (*Id.* at 117:18-20) Snead testified that all user

identification access was locked down so that the systems could not be used after February 28, 2007. (*Id.* at 113:20-114:23) He further testified that the Best Style software was not used for any reporting purposes. (*Id.* at 114:24-115:2) Snead stated that the migration from Best Style onto Baker Standard system took place right up to February 28, 2007 and there was no time to simply erase the Best Style software from the server. (*Id.* at 118:3-9) He claimed BTIL had no reason to access the Best Style software after that date. Thus, it was simply left on the server. (*Id.*)

Upon the sale of assets to BTIL, CFLC required the Debtors and BTIL to execute Non-Use Agreements. The relevant language reads as follows:

> It is understood, agreed, and acknowledged that the Purchaser [BTIL and its affiliates] have not used and/or will not use any of the leased property described in Lease No. 01/1A beyond February 9, 2007. Additionally, PURCHASER will not use any updates, revisions, upgrades, new versions, enhancements, modifications, derivative works, maintenance fixes, translations, adaptations, or copies of software listed on Lease No. 01/1A ("Leased Property"). . .If PURCHASER is found to be using any portion of the Leased Property after February 9, 2007, then liquidated damages shall be immediately payable to the Lessor in an amount stated in the Consent Order executed herewith.

(*See* Hrg. Ex. P-2 & P-3)

BTIL argues that CFLC's interest is only in the Best Style system, not Baker Standard, since no payment was made for Baker Standard. (*See* BTIL Ltr., 2) BTIL also maintains that CFLC did not put forth evidence that the systems were operated as one. (*Id.*) Moreover, BTIL contends that the relationship is one of financing or funding and not one where there are enforceable ownership or property rights. (*See* BTIL Ltr., 3) Based upon the settlement between CFLC and the Chapter 7 Trustee, the Court need not address whether this is a lease or a financing arrangement since there is no impact here upon the Debtors' estates. Schedule 5.2(n) of the Asset Purchase Agreement

between BTIL and the Debtors lists the Material Contracts capable of being assumed and assigned. The CFLC Lease is included; however, only Schedule 1A and 3 are included. Schedule 1 for the Best Style software is not listed. (*See* Hrg. Ex. P-9, Ex. A)  For that reason, BTIL seeks through its cross-motion an amendment of the Consent Order to remove reference to Schedule 1 since  it was not on notice to be included in the Asset Purchase Agreement. BTIL acknowledges to limited use of the software in February 2007 to complete the transition post-sale and paid CFLC for such usage in accordance with the Consent Order.   (*See id.* at ¶ 16)

In opposition, CFLC argues that the systems are one (migration is acknowledged) and they have made payments in accordance with the Lease and thus have the ability to control use. Testimony showed that maintenance was paid for both systems by CFLC on behalf of Best Manufacturing. (*See* Hrg. Tr. at 82:14-18)  Moreover, Leslie Jewett, Chief Financial Officer of CFLC, testified that license fees paid by CFLC under the Best Manufacturing License Agreement included the rights to use and acquire Baker Standard by way of the Assignment Agreement. (*Id.* at 98-100)  Thus, both systems vested in Best Manufacturing.  (*Id.* at 100:10-14)  Looking at Schedule 1 and 1A themselves with their attached invoices, it is difficult to decipher payments made specifically for Best Style or Baker Standard.

However, it is clear from testimony that BTIL continued to utilize the Baker Standard software for reference and display purposes. (*Id.* at 118)  Snead testified that certain Baker Hospitality Division information was not properly converted and thus BTIL needed to look at this information on the screen using Baker Standard. (*Id.*) The information in the Baker Standard system includes information previously located within Best Style.  The information is frozen at February

28, 2007 and no new reports can be created using the Baker Standard, but the existing information can be accessed for reference. (*See* Hrg. Tr. 160-163)

Looking at all of the evidence before the Court, both through certification and testimony, it is clear the Baker Standard is used by BTIL for only limited display purpose and that it contains the information once stored on Best Style prior to the migration. Baker's assignment of the GEAC System 21 listed on Schedule 1 to Best Manufacturing created a system with 125 users which is seemingly now one system. (*See* Ex. BT-2) The invoices put into evidence show payments for System 21 without specifying Best Style or Baker Standard. Most importantly, BTIL executed a Non-Use Agreement in conjunction with the Consent Order which references Lease No. 1/1A. Thus, the Court concludes there has been a violation of the Consent Order by BTIL through, at the least, the use for display and reference purposes.

BTIL argues that this Court should amend the Consent Order to exclude the property listed on Schedule 1 of the Lease, including the CFLC server and its software, on account of mistake or excusable neglect under Federal Rule of Civil Procedure 60(b).

Courts interpret consent orders, like other contracts, in accordance with their plain language. *Holland v. New Jersey Dept. of Corrections*, 246 F.3d 267 (3d Cir. 2001). "[W]here the terms of a contract are clear and unambiguous there is no room for interpretation or construction and the courts must enforce those terms as written." *Karl Sales & Service, Inc. v. Gimbel Brothers, Inc.*, 249 N.J. Super. 487, 493 (App. Div. 1991); *see e.g. M.J. Paquet, Inc. v. New Jersey Dept. of Trans.*, 171 N.J. 387, 396 (2002); *Wellington v. Estate of Wellington*, 359 N.J. Super. 484, 495 (App. Div. 2003). "Courts do not rewrite contracts into which parties have freely and voluntarily entered," *Perkins v. Daimler Chrysler Corp.*, 383 N.J. Super. 99, 113 (App. Div. 2006), nor "make better deals for

parties than they freely and voluntarily chose to make for themselves." *Seaview Orthopaedics v. Nat'l Healthcare Resources, Inc.*, 366 N.J. Super. 501, 510 (App. Div. 2004).

Federal Rule of Civil Procedure 60(b) is made applicable to bankruptcy proceedings pursuant to Federal Rule of Bankruptcy Procedure 9024. "The general purpose of Rule 60(b) . . . is to strike a proper balance between the conflicting principles that litigation must be brought to an end and that justice must be done." *Coltec Indus., Inc. v. Hobgood*, 280 F.3d 262, 271 (3d Cir. 2002) (quoting *Boughner v. Sec'y of Health, Educ. & Welfare*, 572 F.2d 976, 977 (3d Cir. 1978)). Federal Rule of Civil Procedure 60(b)(1) allows a court to relieve a party of a judgment due to "mistake, inadvertence, surprise, or excusable neglect." The Third Circuit, in *Budget Blinds, Inc. v. White*, held that a district court should consider the following factors when determining whether to vacate a judgment under Rule 60(b)(1): "(1) whether the plaintiff will be prejudiced; (2) whether the defendant has a meritorious defense; and (3) whether the default was the result of the defendant's culpable conduct." *Budget Blinds, Inc. v. White*, 536 F.3d 244, 256 (3d Cir. 2008) (citing *U.S. v. $55,518.05 in U.S. Currency*, 728 F.2d 192 (3d Cir. 1984)). At the threshold, the Court must ask whether the aggrieved party possesses a meritorious defense. *Frost v. Subramanian (In re Subramanian)*, 245 Fed. Appx. 111, 115 (3d Cir. 2007) (citing *Resolution Trust Corp. v. Forest Grove*, 33 F.3d 284, 288 (3d Cir. 1994)). The determination of excusable neglect is an equitable one under the totality of the circumstances. *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993) (seminal case describing the excusable neglect standard under Fed. R. Bankr. P. 9006). Relevant concerns include, but are not limited to, "the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant

acted in good faith." *Id.* at 395. The Third Circuit Court of Appeals has extended the excusable neglect standard set forth in *Pioneer* to motions made pursuant to Federal Rule of Civil Procedure 60(b)(1). *See George Harms Constr. Co., Inc. v. Chao*, 371 F.3d 156, 163-64 (3d Cir. 2004). "[I]t is the simple, everyday error -- an unnoticed typo, a mistaken diary entry -- which is virtually inevitable for every lawyer regardless of the level of competence or diligence he brings to a case" that constitutes excusable neglect under Rule 60(b)(1). *Tamarkin v. Wells (In re Wells)*, 87 B.R. 862, 865 (Bankr. E.D. Pa. 1988) (citation omitted).

The unrefuted testimony of CFLC was that CFLC intended the language to mean exactly what it said – BTIL would not use the GEAC 21 Software described in Sch. 1A, including both the Best Styles and the Baker Standard software versions, and if it did use such software it would pay for it. BTIL submitted no evidence of any other meaning. It submitted no evidence of mistake or of any intent to exclude GEAC 21 Standard software nor did it supply any testimony that it did not understand the contract language either when the settlement was entered or when it was signed. Indeed, BTIL's witness was unaware of any efforts whatsoever by anyone at BTIL prior to entering the settlement to determine what was included in Schedule 1.

The above establishes liability for violation of the terms of the Consent Order. The Court is mindful of its role in fixing damages and the discretion it enjoys. *See Howard Johnson Int'l, Inc. v. DKS, LLC*, 08-2316 (JAG), 2009 U.S. Dist. Lexis 74183, *6 (D.N.J. Aug. 19, 2009) (citing *Jones v. Winnepesaukee Realty*, 990 F.2d 1, 4 (1st Cir. 1993)) (court has discretion in awarding damages). It is unknown whether the software in issue is still being used, even for display and reference purposes, since the evidential hearing. In light of the litigation and the risks involved, BTIL may have terminated use at some point in time or the information's usefulness may have expired.

Therefore, the parties are directed to file supplemental certifications as to damages. CFLC is to file its damage certification within ten (10) days of receipt of this opinion. BTIL is to file a reply, if necessary, seven (7) days thereafter. The Court will then enter an award.

An Order in Conformance with this Opinion has been entered by the Court and a copy is enclosed.

/s/ *Donald H. Steckroth*

---

DONALD H. STECKROTH
UNITED STATES BANKRUPTCY JUDGE

Dated: February 21, 2012